UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTHONY S. FUSCO,

                Plaintiff,

   -against-

COUNTY OF PUTNAM, NEW YORK; PUTNAM
COUNTY SHERIFF'S OFFICE; PUTNAM
COUNTY CORRECTIONAL FACILITY; DONALD
B. SMITH; PATRICK O'MALLEY; WILLIAM J.
MOONEY; JAMES E. GREENOUGH; WILLIAM D.
SPINELLI; KIA W. BLANCHARD; WANDA L.
HATCHETT-JACKSON; TRUDY GIAMPOLO,
                Defendants.

No. 15-CV-08132 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff Anthony Fusco commenced this *pro se* action pursuant 42 U.S.C. § 1983,

alleging, *inter alia*, violations of his First, Sixth, Eighth, and Fourteenth Amendment rights in

connection with his incarceration at the Putnam County Correctional Facility for civil contempt.

(*See* Am. Compl., ECF No. 28.)

Presently before the Court is Defendants' motion to dismiss the Amended Complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons

that follow, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Factual Background[1]

---

[1] The following facts are primarily derived from the Complaint, and are assumed as true for the


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/18/2018

Plaintiff Anthony Fusco ("Plaintiff") was incarcerated at Putnam County Correctional Facility ("PCCF") form March 12, 2014 to September 7, 2014 for civil contempt relating to his willful failure to pay child support. (Am. Compl. ¶ 17.)

## A. Plaintiff's misbehavior reports and cell lock-ins

During his time at PCCF, Plaintiff frequently utilized the "Law Library" computer while he pursued legal challenges to his continued incarceration. (*Id.* ¶ 51.) The hours during which this computer was available for use, however, often overlapped with the time of day that inmates were called to receive and take their prescribed medications. (*Id.* ¶ 54.) Plaintiff, who was prescribed heart medication at the time, was required to report to a designated area to receive his medication upon such an announcement by PCCF staff. (*Id.* ¶ 27.) Because he was typically engrossed in his work in the Law Library, however, Plaintiff would occasionally miss the first general call. (*Id.* ¶ 55.) As a result, PCCF officers would sometimes call out Plaintiff's name and direct him to report to the designated area for his medication. (*Id.* ¶ 56.)

On the morning of May 1, 2014, Plaintiff was using the Law Library computer when the morning medical announcement was made. (*Id.* ¶ 72.) Because Plaintiff was in the Law Library, he did not hear the general medical call. (*Id.*) As they had done in the past, corrections staff subsequently used the housing unit's speakers to specifically call Plaintiff by name. (*Id.* ¶ 73.) Plaintiff heard the second announcement and immediately went to receive his medication. (*Id.*) Once Plaintiff received his medication, Defendant Blanchard—a corrections officer at PCCF— issued Plaintiff a misbehavior report for failure to report to the designated area the first time the

---

purposes of Defendants' motion to dismiss. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").

announcement was made. (*Id.* ¶ 74.) Specifically, Plaintiff was charged with Obstruction of a Correction Officer's Duties. (*Id.* ¶ 74.) Defendant Blanchard informed Plaintiff that he would be locked in his cell for four hours as punishment. (*Id.*)

On May 7, 2014, Plaintiff filed a grievance concerning the misbehavior report he had been issued one week prior. (*Id.* ¶ 78.) Plaintiff's grievance questioned whether he had actually obstructed an officer's duties through his actions and further argued that he had been charged too harshly. (*Id.*) This grievance was subsequently denied as untimely, despite there being no deadline by which a grievance must be filed in the PCCF Inmate Rules & Regulations. (*Id.* ¶ 82.)

Plaintiff filed another grievance against PCCF personnel on May 16, 2014, grieving both the May 1st lock-in and the denial of his previous grievance. (*Id.* ¶ 83.) Plaintiff's grievance was again denied, as was his appeal. (*Id.* ¶ 84.) Following Plaintiff's attempts to grieve his treatment at PCCF, "corrections staff, including [D]efendants Blanchard, Jackson, and others, adopted a more adversarial pattern of speech and behavior toward [him]." (*Id.* ¶ 85.) For example, "[D]efendants would ask Plaintiff 'How come you can't follow the rules, you're good at writing grievances [?]'" (*Id.*)

On May 21, 2014, Plaintiff was again working at the Law Library computer at the time of the general medical announcement. (*Id.* ¶ 86.*) Consequently, Plaintiff again failed to report to the designated area for his medication. (*Id.*) The correctional staff made a second announcement, this time calling Plaintiff by name. (*Id.*) Upon hearing the second call, Plaintiff reported to the designated area with a clean and washed yogurt cup filled with water to receive his medication. (*Id.*) Corrections Officer Anthony Colello informed Plaintiff, however, that because he had been late to receive his medication and because he brought a yogurt cup rather than a clear cup filled with water, as is required, he was going to receive a misbehavior report and be locked in. (*Id.* ¶

87.)

Plaintiff was locked in to his assigned cell a second time. (*Id.* ¶ 88.) Later that day, Corrections Officer Greco asked Plaintiff to acknowledge and sign the misbehavior report—a request that Plaintiff refused. (*Id.* ¶ 89.) Immediately thereafter, Defendant Spinelli entered Plaintiff's cell and informed Plaintiff that he was being charged with two counts of prisoner misconduct for Obstruction of a Correction Officer's Duties. (*Id.* ¶ 90.)

### B. Plaintiff's segregation and disciplinary hearing

At Defendant Spinelli's order, Plaintiff was immediately pulled out of his cell and taken to segregated housing. (*Id.* ¶ 92.) While in segregated housing, Plaintiff was initially only permitted to leave his cell for a 45 minute period of recreation each day. For the other twenty-three and a quarter hours of the day, Plaintiff was confined to his solitary cell. (*Id.* ¶ 96.)

On May 21, 2014, Plaintiff filed a grievance against his solitary confinement, which had been imposed without any hearing or process. (*Id.* ¶ 97.) On May 27, 2014, prison staff eased Plaintiff's segregation slightly, allowing him to using the "day area" in the segregated housing unit, but refusing to permit him to rejoin the main housing or use the telephone. (*Id.* ¶ 97.)

A disciplinary hearing was held on June 3, 2014 before Defendant Mooney, an employee of the Putnam County Sheriff's Department who served as the trier of fact in prison disciplinary matters. (*Id.* ¶ 108.) Before the hearing began, Plaintiff requested legal assistance. (*Id.* ¶ 109.) Defendant Mooney denied Plaintiff's request and stated that Plaintiff shouldn't need counsel because he was "so good at writing grievances." (*Id.*)

During the hearing, Plaintiff complained that his confinement in segregated housing prior to the hearing prevented him from identifying and speaking with any witnesses. (*Id.* ¶ 111.) Plaintiff was, however, allowed to question the witnesses called by PCCF staff. (*Id.* ¶ 111–13.)

Among those witnesses was Officer Colello, who testified that he did not believe that Plaintiff had missed the call for medications intentionally. (*Id.* ¶ 112.)

Following the hearing, Defendant Mooney found Plaintiff guilty of both counts of misconduct for Obstruction of a Correction Officer's Duties. (*Id.* ¶ 115.) In a final decision issued on June 10, 2014, Defendant Mooney imposed a sanction of 180 days of in-cell confinement and loss of privileges against Plaintiff, with 90 days to be served and 90 days to be held in abeyance. (*Id.* ¶ 116.) On June 12, 2014, Plaintiff filed an appeal of Defendant Mooney's decision to the Chief Administrative Officer of the PCCF. (*Id.* ¶ 117.) Plaintiff's appeal was declined in a three-sentence order by Captain O'Malley on June 19, 2014. (*Id.* ¶ 119.)

Plaintiff was moved back to segregated housing after the disciplinary hearing and the few privileges that he had been allowed while awaiting the hearing were revoked. (*Id.* ¶ 120.) During his period of segregation, Plaintiff was not allowed to make any telephone calls, including any calls to his children. (*Id.* ¶ 123.) Plaintiff was also prohibited from having any books in his cell other than for religious or directly educational purposes. (*Id.* ¶ 124.) Additionally, Plaintiff was not allowed to participate in Roman Catholic mass services, despite his numerous requests to do so. (*Id.* ¶ 121.) Prior to his segregation, Plaintiff had participated in such services on a weekly basis. (*Id.* ¶ 122.)

Plaintiff filed numerous grievances regarding these deprivations throughout his period of segregation. (*Id.* ¶ 128.) However, his grievances were "patently and systematically" denied by the grievance officer, Defendant Greenough, as well as the Captain and commanding officer, Defendant O'Malley. (*Id.*) Further, Plaintiff attempted to air his grievances directly to Defendant Sheriff Donald B. Smith on July 4, 2014. (*Id.* ¶ 129.) On that date, Plaintiff called out to Defendant Smith as he passed his cell and asked that he contact Plaintiff. (*Id.*) Defendant Smith

asked why Plaintiff wanted to speak to him, and Plaintiff responded that he wanted to tell Defendant Smith "what was going on" in the correctional facility. (*Id.*) Defendant Smith never followed through with Plaintiff's request. (*Id.* ¶ 130.)

### C. Procedural Background

Plaintiff filed the present *pro se* action pursuant 42 U.S.C. § 1983, alleging, *inter alia*, violations of his First, Sixth, Eighth, and Fourteenth Amendment rights as well as violations of state law in connection with his incarceration at PCCF on October 15, 2015. (ECF No. 1.) Plaintiff subsequently filed an Amended Complaint on April 25, 2017. (ECF No. 28.) Defendants filed a motion to dismiss the Amended Complaint on August 28, 2017, arguing that Plaintiff failed to state any federal or state claim. (ECF No. 36.) The Court now considers each of Defendants' arguments in turn.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. In considering a 12(b)(6) motion, the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (internal quotation marks omitted). Nor must the Court credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.*

Further, a court is generally confined to the facts alleged in the complaint for the purposes of considering a motion to dismiss pursuant to 12(b)(6). *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). A court may, however, consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *Kleinman v. Elan Corp., plc*. 706 F.3d 145, 152 (2d Cir. 2013).

"Where, as here, a plaintiff proceeds *pro se*, the court must 'construe [ ] [his] [complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s].'" *Askew v. Lindsey*, No. 15-CV-7496 (KMK), 2016 WL 4992641, at *2 (S.D.N.Y. Sept. 16, 2016) (alterations in original) (citing *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013)). Yet, "'the liberal treatment afforded to *pro se* litigants does not exempt a *pro se* party from compliance with relevant rules of procedural and substantive law.'" *Id.* (quoting *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013)).

## DISCUSSION

### I.     Monell Claim

Defendants first argue that Plaintiff has failed to state a claim against the County of Putnam for violations of his constitutional rights under §1983. This Court agrees.

"Congress did not intend municipalities to be held liable [under §1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). A municipality, thus, "may not be held liable under §1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997). Rather,

to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; *and* (5) that an official policy of the municipality caused the constitutional injury."

*Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (emphasis added).

A plaintiff may satisfy the "official municipal policy" requirement by alleging the existence of:

(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who came into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted); *see also Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301 (KMK), 2018 WL 1626175, at *11 (S.D.N.Y. Mar. 30, 2018).

Here, Plaintiff contends that the constitutional injuries he suffered were a direct result of the inadequate training and supervision of the correctional officers employed by the County of Putnam. (Pl.'s Opp. at 22, ECF No. 41.) A claim for failure to train and inadequate supervision, however, requires a showing of "'deliberate indifference' to the rights of persons encountered by the [municipal] employees." *Schnitter v. City of Rochester*, 556 F. App'x 5, 9 (2d Cir. 2014) (summ. order) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference "is a stringent standard of fault," which requires a plaintiff to establish that "the need for more or better supervision to protect against constitutional violations was obvious." *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (internal quotation marks omitted). Plaintiff fails to plead any specific factual allegations that could lead to such an inference in the

present action. Indeed, he provides no information regarding in what ways Defendants' training is inadequate or how that training was related to the alleged constitutional violations. *See Walker v. City of New York*, No. 14-CV-808 (ER), 2015 WL 4254026, at *11 (S.D.N.Y. July 14, 2015) (dismissing a failure to train claim where plaintiff "failed to plead any facts that suggest a failure to train the [defendants] caused his constitutional violation"); *Triano v. Town of Harrison, NY*, 895 F. Supp. 2d 526, 539 (S.D.N.Y. 2012) (dismissing failure to train claim where plaintiff failed to provide "any supporting factual detail about alleged deficiencies in the training program, or regarding other instances of [ ] misconduct which could be attributed to a failure to train"); *Marte v. New York City Police Dep't*, No. 10-CV-3706 (PKC), 2010 WL 4176696, at *3 (S.D.N.Y. Oct. 12, 2010) (dismissing plaintiffs' failure to train claim where they did not plead "any facts that plausibly allege a specific deficiency in the training or supervision program that accounts for deprivation of their constitutional rights").

Instead, Plaintiff's claims largely center on the discrete acts of municipal employees. However, "[a] municipal agency may not be held liable under § 1983 simply for the isolated unconstitutional acts of its employees." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992). Plaintiff's conclusory attempts to frame these isolated unconstitutional acts as the result of municipal policy or custom are precisely the type of "threadbare recitals of the elements of a cause of action" that need not be afforded any credence by this Court. *See Schnitter*, 556 F. App'x at 7. Accordingly, Plaintiff's conclusory federal claims against the municipal Defendants—including the County of Putnam, the Putnam County Sheriff's Office, and Putnam County Correctional Facility[2]—are dismissed.

---

[2] "Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate existence. Therefore, municipal departments are . . . not amenable to suit." *Magnotta v. Putnam Cty. Sheriff*, No. 13-CV-2752 (GBD) (GWD), 2014 WL

## II.    14th Amendment Due Process claims[3]

### A.  Procedural Due Process

The Court finds that Plaintiff has successfully stated a procedural due process claim.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. To state a procedural due process claim, Plaintiff must show "(1) that Defendants deprived him of a cognizable interest in life, liberty, or property, (2) without affording him constitutionally sufficient process." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

Prison discipline typically implicates a protected liberty interest "only if the discipline

---

705281, at *9 (S.D.N.Y. Feb. 24, 2014) (internal quotation marks omitted) (quoting *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999)). Accordingly, even if Plaintiff had adequately stated a claim against Putnam County, his claims against the Putnam County Sheriff's Office and the Putnam County Correctional Facility would nonetheless be subject to dismissal because those Defendants are merely departments of their municipality and are not independently amenable to suit.  *Id.*

[3]      Plaintiff raises the similar claims under the Eighth Amendment. However, "[a]s the Supreme Court has held, an incarceration resulting from civil contempt is essentially a civil remedy designed for the benefit of other parties and  . . . exercised for centuries to secure compliance with judicial decrees." *United States v. Dien*, 598 F.2d 743, 745 (2d Cir. 1979) (internal quotations omitted) (quoting *Uphaus v. Wyman*, 360 U.S. 72, 81 (1959)). Like pretrial detention and unlike a criminal sentence, the purpose of civil contempt detention is, thus, not punitive in nature. *See Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–28 (1994) (noting that a contempt sanction is *civil* if it is "remedial and for the benefit of the complainant" and *criminal* if it is "punitive, to vindicate the authority of the court"); *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 101 (2d Cir. 2016) (recognizing that unlike criminal sanctions, civil contempt sanctions are coercive but not punitive). The Eighth Amendment, which governs *punishment*, is therefore inapplicable to civil contemnors. *Dien*, 598 F.2d 743 (citing *Ingraham v Wright*, 430 U.S. 651, 667-68 (1977)). Indeed, Plaintiff has not been convicted of any crime and, therefore, "may not be punished in any manner—neither cruelly and unusually nor otherwise." *See Iqbal*, 490 F.3d at 168.
       Accordingly, as with pre-trial detainees, this Court will analyze Plaintiff's claims under the framework of the Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment.").

imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2006) (internal quotation marks omitted). The Second Circuit, however, has limited the application of this standard to *convicted* prisoners, finding it inapplicable to pretrial detainees. *Iqbal v. Hasty*, 490 F.3d 143, 163 (2d Cir. 2007) (recognizing that "pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process"), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In so ruling, the Second Circuit recognized that the "atypical and significant hardship" standard was "grounded on the idea that a *conviction* extinguishes liberty interests." *Benjamin v. Fraser*, 264 F.3d 175, 189 (2d Cir. 2001) (emphasis added). While Plaintiff is not a pretrial detainee, he was similarly not incarcerated following a criminal conviction. Thus, the "atypical and significant hardship" requirement appears equally inapplicable to Plaintiff, who, as a civil contemnor, was never subject a criminal conviction and sentence.

Therefore, Plaintiff—like a pretrial detainee—was entitled to due process prior to being subjected to segregation, regardless of whether that segregation posed an atypical hardship. *Johnston v. Maha*, 606 F.3d 39, 41 (2d Cir. 2010) ("This Circuit has found that procedural due process requires that pretrial detainees can only be subjected to segregation or other heightened restraints if a pre-deprivation hearing is held to determine whether any rule has been violated."). As to what process is due, the Supreme Court has recognized that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v.McDonnell*, 418 U.S. 539, 556 (1974). An inmate facing disciplinary confinement is nevertheless "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present

documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary action taken." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). "In addition, the disciplinary ruling must be supported by 'some reliable evidence.'" *Smith v. Arnone*, 700 F. App'x 55, 56 (2d Cir. 2017) (summ. order) (quoting *Sira*, 380 F.3d at 69).

Here, Plaintiff has plausibly alleged a violation of these rights. First, Plaintiff alleges that while he was able to question the witnesses called against him, he was deprived of any meaningful opportunity to call his own witnesses. (Am. Compl. ¶ 111.) Plaintiff also includes factual allegations that plausibly suggest that he was not provided with a fair and impartial hearing officer. Namely, Plaintiff alleges that when he reiterated his request for counsel to the hearing officer—Defendant Mooney—the officer responded that Plaintiff would not need assistance because he was "so good at writing grievances." (*Id.* ¶ 109.) Drawing all reasonable inferences in Plaintiff's favor, as the Court must for the purposes of this motion, such a statement could be indicative of a retaliatory bias harbored by Defendant Mooney due to Plaintiff's frequent attempts to file grievances. Accordingly, this Court finds that Plaintiff has plausibly alleged that he received inadequate process prior to being subjected to restrictive housing, in violation of the 14th Amendment.[4]

### B. Substantive Due Process

"[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication

---

[4] To the extent that Plaintiff attempts to assert a distinct Sixth Amendment claim for his lack of counsel during the disciplinary proceeding, such a claim is dismissed. The Supreme Court has made clear that inmates do not have a right to counsel in prison disciplinary hearings. *Wolff*, 418 U.S. 539 (1974); *see also Milling*, 876 F.3d at 55 n.3 (noting that procedural due process requires *only* that a non-criminally sentenced detainee be given "written notice, adequate time to prepare a defense, a written statement of the reasons for action taken, and a limited ability to present witnesses and evidence" before being subjected to disciplinary segregation).

of guilt in accordance with due process of law." *Wolfish*, 441 U.S. at 535. An individual who has

not been adjudged guilty of a crime, like Plaintiff, may therefore only be subjected to the

restrictions and conditions of a detention facility "so long as those conditions and restrictions do

not amount to punishment." *Id.* at 536. The Second Circuit has recognized that in assessing

whether prison restrictions imposed on individuals without criminal convictions comport with

substantive due process, "'[a] court must decide whether the [restriction] is imposed for the

purpose of punishment or whether it is but an incident of some other legitimate governmental

purpose.'" *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 61 (2d Cir. 2017) (quoting

*Wolfish*, 441 U.S. at 538).[5] That determination will generally turn on whether the restriction has

an alternative purpose and whether it appears excessive in relation to that alternative purpose.

*Wolfish*, 441 U.S. at 538. If, however, "a restriction or condition is not reasonably related to a

legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose

of the governmental action is punishment that may not constitutionally be inflected upon

detainees *qua* detainees." *Milling*, 878 F.3d at 55 (internal quotation marks omitted) (quoting

*Wolfish*, 441 U.S. at 539).

The government undoubtedly has a "legitimate interest in the in the security of prisons."

*Id.*; *see also Proctor*, 846 F.3d at 610 (2d Cir. 2017) (recognizing institutional safety and security

as "perhaps a prison facility's most important considerations"—making a state's interest in

flexible restrictive housing procedures "substantial"). Accordingly, the Second Circuit has

allowed the placement of non-convicted detainees in restrictive housing where such measures

---

[5] Although the Second Circuit was specifically addressing the substantive due process rights of
pre-trial detainees in the *Milling* case, the reasoning appears to apply with equal force to
Plaintiff. *See* 878 F.3d at 55. Indeed, just like a pre-trial detainee, Plaintiff was not confined
pursuant to an adjudication of criminal guilt. Accordingly, this Court will apply the more
protective standards for pre-trial detainees to the present action.

were taken "in response to specific evidence that those detainees posed a risk to institutional security and where the measures were not excessive in relation to that purpose." *Milling*, 878 F.3d at 55–56.

In the present case, however, Plaintiff contends that: (1) there was no evidence he posed any risk to institutional security, and (2) his 90-day segregation sentence was excessive and disproportionate to the allegations against him. (Am. Compl. ¶¶ 137–38.) Specifically, Plaintiff was subjected to 90 days in restrictive housing. (*Id.* ¶ 121.) During that time, Plaintiff was locked in his cell over twenty three hours a day, was not permitted to attend religious services, make or receive telephone calls, or have any books in his cell that were not either for religious or directly educational purposes—all for his delay in reporting to the designated medication area and attempting to take his prescribed medication using a yogurt cup filled with water. (*Id.* ¶¶ 121– 127.) Defendants fail to advance any explanation of how these conditions of Plaintiff's segregation were reasonably related to their ostensible goal of prison security. Although this Court recognizes that Defendants may ultimately be able to justify Plaintiff's segregation as bearing a reasonable relation to institutional security, Plaintiff has plead sufficient facts to plausibly allege that no such relation exists. Accordingly, this Court finds that Plaintiff has adequately pled a substantive due process claim. *See Milling*, 876 F.3d at 58 (noting that the placement of a non-convicted detainee may be violative of substantive due process where prison officials fail to show that the placement and its conditions were reasonably related to a legitimate governmental purpose and not so excessively harsh as to be punitive).

III.    **First Amendment Claims**

    **A.  Retaliation**

Plaintiff alleges that all named Defendants harassed him and subjected him to segregated housing in retaliation for the numerous grievances he filed while incarcerated at PCCF. (Am. Compl. ¶ 134.) While Plaintiff has adequately pled a First Amendment retaliation claim against Defendant Mooney, he fails to plausibly allege a retaliation claim against all other named Defendants.

"To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

Here, there is no doubt the filing of prison grievances is a constitutionally protected activity. *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). Plaintiff, therefore, meets the first prong of the test for retaliation claims.

Plaintiff similarly satisfies the second prong; placement in segregated housing constitutes a sufficiently adverse action to support a plausible retaliation claim. An adverse action is any action "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Id.* at 353 (internal quotation marks omitted). "The question of whether a given action is sufficiently adverse to deter someone of 'ordinary firmness from exercising his rights" under the First Amendment is a question of fact." *Sanchez v. Velez*, No. 08-CV-1519 (NRB), 2009 WL 2252319, at *4 (S.D.N.Y. July 24, 2009). Here, there is no doubt that placement in segregated housing *could* be found sufficiently serious to deter an inmate "of ordinary firmness" from exercising his right to complain about staff misconduct. *See Id.* (finding allegations that an inmate was placed in involuntary protective custody and threatened with

disciplinary segregation sufficient to plead an adverse action); *see also Hill v. Laird*, No. 06-CV-0126 (JS) (ARL), 2014 WL 1315226, at *8 (E.D.N.Y. Mar. 31, 2014) (finding mere *threats* to place an inmate in segregated housing sufficient to plead an adverse action).

Nevertheless, Plaintiff's largely conclusory and overly general allegations of retaliation are insufficient to plausibly plead a First Amendment retaliation claim against a majority of the named Defendants. Namely, Plaintiff fails to allege that many of the named Defendants played a direct role in the adverse action—i.e. his placement in segregation. Further, even for the Defendants who did play a role in Plaintiff's placement in segregation, Plaintiff fails to specifically allege any causal connection between their actions and his protected conduct. Plaintiff merely claims that "Defendants generally adopted a more adversarial pattern of speech and behavior" towards him and made statements referring to Plaintiff's propensity for filing grievances after he filed a number of grievances relating to his treatment at PCCF. (Am. Compl. ¶ 85.) Plaintiff, however, fails to allege which Defendants engaged in this behavior or made the aforementioned statements. While such statements could support an inference that Defendants harbored some retaliatory motive, Plaintiff's allegations lack the specificity to make that inference with regard to any particular Defendant.

Plaintiff does, however, allege sufficient facts to state a First Amendment retaliation claim against Defendant Mooney. Defendant Mooney, the officer who presided over Plaintiff's disciplinary hearing, undoubtedly played a role in Plaintiff's placement in segregation. Further, Plaintiff alleges that Defendant Mooney rejected his final request for assistance with the hearing, stating that Plaintiff would not need counsel because he was "so good at writing grievances." (*Id.* ¶ 110.) Drawing all reasonable inferences in Plaintiff's favor—as the Court must at this juncture—such a statement could suggest that Defendant Mooney harbored some animosity

towards Plaintiff for his frequent efforts to file grievances and that such animosity was the motivating factor behind Plaintiff's prolonged segregation sentence. Accordingly, this Court finds that Plaintiff has sufficiently stated a First Amendment retaliation claim against Defendant Mooney. Plaintiff's First Amendment retaliation claims against all other Defendants are dismissed. To the extent that Plaintiff may, in good faith, allege facts relating to the specific retaliatory motives of any other Defendants, Plaintiff is granted leave to replead his claim.

**B. Free Exercise**

"The Free Exercise Clause of the First Amendment is an 'unflinching pledge to allow our citizenry to explore . . . religious beliefs in accordance with the dictates of their conscience.'" *Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (quoting *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984)). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). However, the Second Circuit has acknowledged that, "although prisoners do not abandon their constitutional rights at the prison door, [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (internal quotation marks and citations omitted). Accordingly, the First Amendment protection afforded to inmates must be balanced with "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford*, 352 F.3d at 588.

To establish a Free Exercise claim, an inmate plaintiff must typically plead that a sincerely held religious belief was substantially burdened by conduct that was not reasonably related to a legitimate penological interest. *Turner v. Sidorowicz*, No. 12-CV-7048 (NSR), 2016

WL 3938344, at *5 (S.D.N.Y. July 18, 2016); *Holland v. Goord*, 758 F.3d 215, 220–23 (2d Cir. 2014). The Second Circuit, however, has not decided whether the substantial burden standard remains viable following the Supreme Court's suggestion in *Employment Division v. Smith*, 494 U.S. 872, 887 (1990), that such a test "embroils courts in the unacceptable business of evaluating the relative merits of differing religious claims." *Holland*, 758 F.3d at 220 (internal quotation marks omitted). Nevertheless, this Court need not address the issue here: even assuming the continuing viability of the substantial burden test, Plaintiff has plausibly alleged that his First Amendment rights were violated.

As an initial matter, Defendants do not contest the sincerity of Plaintiff's religious beliefs. (Def.'s Mot. at 13.) The only remaining question, therefore, is whether those religious beliefs were substantially burdened by conduct that was not reasonably related to some legitimate penological interest. The Second Circuit has specified that "[t]he relevant question in determining whether [a plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593–94.

Here, Plaintiff alleges that he was prevented from attending Catholic mass during his placement in segregation, despite his numerous requests to participate in such services. (Am. Compl. ¶ 135.) Those allegations, taken as true, are sufficient to satisfy the substantial burden requirement. "It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993). While forcing an inmate to miss one religious service may not rise to the level of a substantial burden on the inmate's right to the free exercise of his religion, denying an inmate religious services over a prolonged period may violate the First Amendment. *Jones v. Malin*, No. 15-CV-5381

(VB), 2017 WL 985943, at *3 (S.D.N.Y. Mar. 13, 2017) (finding that an allegation that an inmate was prevented from participating in religious services for two months plausibly constituted a substantial burden on his right to free exercise). Plaintiff's allegation that he was prevented from attending religious services during the pendency of his segregation—which lasted over one month—are enough to survive a motion to dismiss, particularly in light of Defendants' failure to advance any argument that such a prolonged deprivation was reasonably related to institutional security or any other penological interest. Defendants' motion to dismiss Plaintiff's free exercise claim is, thus, denied.

## IV. Conspiracy

Plaintiff also fails to adequately plead a § 1983 conspiracy claim. "To establish a § 1983 conspiracy, plaintiff must prove (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Albritton v. Morris*, No. 13-CV-3708 (KMK), 2018 WL 1690526, at *18 (S.D.N.Y. Mar. 29, 2018) (internal quotation omitted).

Notably, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Ali v. Ramos*, No. 16-CV-01994 (ALC), 2018 WL 1353210, at *6 (S.D.N.Y. Mar. 14, 2018); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (noting that a complaint must allege facts demonstrating that the parties acted in concert to state a claim for conspiracy).

Here, Plaintiff has failed to plausibly allege the existence of a conspiracy. Plaintiff "offers not a single fact to corroborate [his] allegation of a 'meeting of the minds' among the

conspirators." *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011). Rather, Plaintiff relies

entirely on conclusory allegations that "Defendants agreed and conspired to deprive" him of his

constitutional rights. (Am. Compl. ¶ 144.) Such allegations, without more, are insufficient to

survive a motion to dismiss. *See Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003) (finding

dismissal under Rule 12(b)(6) proper where "plaintiff [did] not allege[ ], except in the most

conclusory fashion, that any [ ] meeting of the minds occurred among any or all of the

defendants"); *Ali*, 2018 WL 1353210, at *6 (same). Accordingly, Plaintiff's conspiracy claims

are dismissed. To the extent that Plaintiff may, in good faith, allege more specific facts regarding

the "meeting of the minds" between any of the Defendants, Plaintiff is granted leave to replead

his claim.

## V.    Personal Involvement of Sheriff Donald B. Smith

Defendants next contend that Plaintiff has failed to allege the personal involvement of

Defendant Smith in any constitutional violation. This Court agrees.

Although Defendant Smith enjoys a supervisory role as the Putnam County Sheriff, "a

defendant in a §1983 action may not be held liable for damages for constitutional violations

merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.

1996); *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Instead, "a

plaintiff must establish a given defendant's *personal involvement* in the claimed violation in

order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823 F.3d 125,

136 (2d Cir.) (emphasis added) (internal quotation marks omitted), *cert. denied sub nom. Brooks

v. Pataki*, 137 S. Ct. 380 (2016). As the Second Circuit has explained, the personal involvement

of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the
> defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Courts in this Circuit, however, are "divided as to whether the five categories announced in *Colon* may still be used as bases for liability under § 1983" following the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See Allah v. Annucci*, No. 16-CV-1841 (KMK), 2017 WL 3972517 at *6 (S.D.N.Y. Sept. 07, 2017).

Even assuming the continuing vitality of all of the *Colon* factors, Plaintiff has failed to allege the personal involvement of Defendant Smith. The only allegations against Defendant Smith in the Amended Complaint are that he "never availed himself of the request for him to hear first-hand of Plaintiff's ordeal." (Am. Compl. ¶ 130.) Plaintiff does not allege, however, that Defendant Smith "failed to remedy" any wrong or ongoing constitutional violation of which he was aware. Indeed, Plaintiff's own allegations seem to suggest that Defendant Smith was not aware of Plaintiff's grievances because he refused to meet with or contact Plaintiff. (*Id.* ¶ 129.) Nor has Plaintiff alleged any facts to suggest that Defendant Smith had any duty to hear his grievances directly, which were not being raised through the correctional facility's official grievance procedure. Similarly, Plaintiff fails to plead any facts regarding Defendant Smith's role in supervising the other named Defendants in this action and whether his supervision was in any way "grossly negligent."

Further, as this Court has already discussed, Plaintiff has not alleged any custom or policy that caused the constitutional violations. *See supra* Section I. Thus, Defendant Smith cannot be said to have "created a custom or policy under which the unconstitutional practices

occurred." *See Colon*, 58 F.3d at 873. Finally, Plaintiff similarly fails to allege any facts to suggest that Defendant Smith acted with deliberate indifference or even gross negligence to his constitutional rights. Accordingly, Plaintiff does not plausibly allege Defendant Smith's personal involvement even under the most liberal application of *Colon*. To the extent that Plaintiff may allege Defendant Smith's personal involvement in any underlying constitutional violation with greater specificity, he is granted leave to replead his claims.

## VI.    State Law Claims

### a.    Abuse of Process

Plaintiff fails to plausibly allege a claim for abuse of process against any Defendant. "To state a claim for abuse of process under New York law, a plaintiff must allege that a defendant '(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of process." *Gilman v. Marsh & McLennan Companies, Inc.*, 868 F. Supp. 2d 118, 131 (S.D.N.Y. 2012) (quoting *Savino v. City of New York*, 331 F.3d 63, 70 (2d Cir. 2003)), *aff'd,* 654 F. App'x 16 (2d Cir. 2016).

Here, Plaintiff contends that Defendants issued prisoner misconduct charges and excessive and unwarranted disciplinary sanctions "to retaliate" against him for exercising his First Amendment right to file prison grievances. Even assuming prison disciplinary charges and proceedings constitute "legal process," Plaintiff's claim nonetheless fails.

"[T]he New York Court of Appeals has made clear that '[a] malicious motive alone . . . does not give rise to a cause of action for abuse of process.'" *Savino v. City of New York*, 331 F.3d 63, 77 (2d Cir. 2003) (quoting *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326–27 (1984)); *see also Allen v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summ. order). Indeed, personal animosity

and retaliation constitute collateral *motives* rather than collateral *objectives*. *Shakima O. v. Westchester Cty.*, No 12-CV-9468, 2014 WL 521608, at \*3 (S.D.N.Y. Feb. 10, 2014); *see also Corley v. City of New York*, No. 14-CV-3202 (GHW), 2015 WL 5729985, at \*17 (S.D.N.Y. Sept. 30, 2015) (finding an inmate plaintiff's allegation that he was transferred as punishment insufficient to state an abuse of process claim because such an ulterior motive did not establish a collateral objective). Accordingly, because he fails to identify any collateral *objectives* beyond the typical disciplinary objectives of prison sanctions, Plaintiff fails to state a claim for abuse of process. Defendants' motion to dismiss Plaintiff's abuse of process claim is, therefore, granted.

### b. IIED

The New York Court of Appeals has enumerated "four elements of a cause of action for intentional infliction of emotional distress: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Chanko v. Am. Broad. Companies Inc.*, 49 N.E.3d 1171, 1178 (2016) (internal quotation marks omitted).

Defendants claim that Plaintiff failed to allege any facts which would support a claim for intentional infliction of emotional distress ("IIED"). (Defs.' Mot. at 22.) This Court, however, need not dissect whether the facts at hand are sufficient to state an IIED claim. The Second Circuit has recognized that IIED "remains a highly disfavored [tort] under New York law." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) (internal quotation marks omitted). Indeed, "the New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct falls well within the ambit of other traditional tort liability." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (1978)). Since

then, every New York Appellate Division court has answered that question in the negative: holding that an IIED claim should not be entertained where another claim is available. *Id.*; *see also Doin v. Dame*, 918 N.Y.S.2d 253, 254 (3d Dep't 2011); *Leonard v. Reinhardt*, 799 N.Y.S.2d 118, 119 (2d Dep't 2005); *Di Orio v. Utica City Sch. Dist. Bd. Of Educ.*, 758 N.Y.S.2d 743, 745 (4th Dep't 2003); *Hirschfeld v. Daily News, L.P.*, 703 N.Y.S.2d 123, 124 (1st Dep't 2000). Accordingly, the Second Circuit has held that "an intentional infliction tort may be invoked only as a last resort." *Salmon*, 802 F.3d at 256 (internal quotation marks omitted). Because Plaintiff's IIED claim is based on the very behavior that forms the basis of his constitutional claims—including Defendants' alleged retaliatory behavior—the IIED claim is dismissed as duplicative. *See Bradshaw v. City of New York*, 17-CV-1199 (AJP), 2017 WL 6060781, at *20 (S.D.N.Y. Dec. 7, 2017); *Universal Calvary Church v. City of New York*, No. 96-CV-4606 (RPP), 2000 WL 1538019, at *12 (S.D.N.Y. Oct. 17, 2000) (finding that a plaintiff's IIED claim was" subsumed" under his § 1983 excessive force claim). In the event that his other claims fail, Plaintiff is granted leave to reassert the IIED claim.

**VII.    Qualified immunity**

Defendants make a cursory argument that they are entitled to qualified immunity for each of Plaintiff's claims. "Qualified immunity is an affirmative defense, on which the defendant officials bear the burden of proof," *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012). However, beyond listing the general elements of qualified immunity, Defendants offer no substantive argument as to why they are immune from suit. (*See* Defs.' Mot. at 23.) Because, Defendants merely asserted qualified immunity in conclusory terms, they have failed to carry their burden. Accordingly, the Court finds that "[a]t this stage of the proceedings, the [ ]

Defendants have failed to establish that they are entitled to qualified immunity as a matter of law." *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 609 (W.D.N.Y. 2015).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

Plaintiff shall have until May 11, 2018 to amend his complaint in accordance with this Court's decision. If Plaintiff elects to file an amended complaint, Defendant shall have until 21 days from the date of Plaintiff's filing to move or file responsive pleadings.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 36. The Clerk of the Court is further directed to mail a copy of this Opinion to *pro se* Plaintiff and file proof of service on the docket.

Dated:   April 18, 2018
        White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge